FILED 15 AUG '11 12:25 USDC-ORE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

ROBERT CHARLES RIDDLE,

              Plaintiff,                    CV-10-358-AA

    v.                                OPINION AND ORDER

MICHAEL J. ASTRUE, Commissioner of Social
Security,

              Defendant.

AIKEN, Judge:

       Plaintiff Robert Charles Riddle appeals the Commissioner's decision denying his applications

for disability insurance benefits and supplemental security income under Titles II and XVI of the

Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). For the following reasons,

the Commissioner's decision is affirmed.

1 - OPINION AND ORDER

Riddle alleged disability beginning on March 9, 2007, due to seizures, vestibular dysfunction, dizziness, poor memory, and headaches. Admin. R. 9, 118, 133. The administrative law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. §§ 404.1520 and 416.920. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987)(describing the decision-making process in detail). As pertinent to this appeal, the ALJ made the following findings.

The ALJ found Riddle's ability to perform basic work activities limited by the combined effects of a seizure disorder, vestibular dysfunction, a depressive disorder, and an anxiety disorder. Admin. R. 11-12. The ALJ found these impairments did not satisfy the criteria for any of the presumptively disabling conditions listed in the regulations. *Id.* at 12-13. The ALJ determined that, despite his impairments, Riddle retained the residual functional capacity ("RFC") to perform work at the light range of exertion, requiring no more than occasional postural activities such as stooping, balancing, and so forth, without exposure to hazards, limited to short simple instructions and routine tasks, and involving no interactions with the general public and only superficial contact with coworkers. *Id.* at 13. The ALJ elicited testimony from a vocational expert ("VE"), who said that a person of Riddle's age, education, work experience, and RFC could perform the activities required for light unskilled occupations such as hardware assembly, small parts assembly inspection, and packaging. The VE testified that these occupations represented over 400,000 jobs in the national economy. *Id.* at 21, 40-41. The ALJ concluded that Riddle had failed to prove he was disabled within the meaning of the Social Security Act. *Id.* at 21-22.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings of fact are supported by substantial evidence in the record as a whole. 42

2 - OPINION AND ORDER

U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). Under this standard, the Commissioner's factual findings must be upheld if supported by inferences reasonably drawn from the record and if evidence exists to support more than one rational interpretation, the court must defer to the factual findings in the Commissioner's decision. *Batson*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

## DISCUSSION

### I.    Claims of Error

Riddle contends the ALJ erred in finding his seizure disorder was not equivalent in severity to Listing 11.03 of the regulatory list of presumptively disabling impairments. Riddle contends the ALJ assessed his functional limitations inaccurately because he improperly rejected Riddle's subjective statements, the lay witness statements, and the medical source statement of a nurse practitioner, and failed to evaluate his mental impairments properly. Riddle contends the ALJ erred by relying on testimony from the VE which conflicted with information in the Dictionary of Occupational Titles ("DOT"). Finally, Riddle contends the Appeals Council erred by failing to find him disabled based on the post-decision statement of a nurse practitioner.

### II.    Listing of Impairments

The Commissioner acknowledges that certain conditions are so severe as to preclude substantial gainful activity. If the medical evidence establishes that a claimant suffers from such a condition, the claimant will be conclusively presumed to be disabled. *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(d), 416.920(d).

The criteria for each presumptively disabling condition are enumerated at 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). The claimant has the burden of proving that he

3 - OPINION AND ORDER

meets or equals the criteria for a listed impairment. *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990); *Burch v. Barnhart,* 400 F.3d 676, 683 (9th Cir. 2005); 20 C.F.R. §§ 404.1526, 416.926. The claimant must produce evidence establishing the symptoms, signs, and laboratory findings specified for the listed impairment.

Listing 11.03 requires a documented, detailed description of a typical seizure pattern, including all associated phenomena, such as the presence or absence of aura, tongue bites, sphincter control, associated injuries, and postictal phenomena. The physician providing the description must indicate the extent to which the description reflects his own observations and the sources of ancillary information. Testimony of witnesses other than the claimant is necessary if a professional observation is not available. The seizures must occur more frequently than once per week despite the individual's compliance with prescribed antieptileptic therapy for at least three months. Compliance with therapy must be shown by objective measures, such as the individual's serum level of prescribed medications. The seizures must be associated with alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. Listing of Impairments, §§ 11.00, 11.03.

The ALJ found that the record showed Riddle's seizures were not of a severity sufficient to satisfy the listing criteria. Admin. R. 12. In March 2007, Riddle complained of dizziness, lightheadedness, and difficulty focusing. He was seen by a physician assistant who informed Riddle's employer that he should not continue working as a truck driver until his dizzy spells could be evaluated. *Id.* at 222-23. Paulo Cancado, M.D., performed a neurological consultation at which Riddle described balance problems associated with a sensation of swaying or tilting. Dr. Cancado obtained normal findings on physical examination and in a brain MRI. He ordered vestibular

function testing which was consistent with bilateral vestibular weakness and EEG examinations which showed abnormal epileptiform discharges. Dr. Cancado did not directly observe any dizziness or seizure activity. *Id.* at 209-10, 237. Dr. Cancado diagnosed a possible partial onset seizure disorder but later completed a questionnaire indicating he did not know whether Riddle experienced true seizures, and if so, did not know their frequency or functional impact. *Id.* at 234-37. Dr. Cancado recommended vestibular rehabilitation, but Riddle said he could not afford this treatment. *Id.* at 237.

During 2007, Riddle received primary care from Susan Peeples, a nurse practitioner. In June 2007, at Dr. Cancado's suggestion, Peeples called three of Riddle's siblings and a friend for descriptions of his symptoms. One sister indicated that Riddle was quite forgetful of plans he had made and sometimes spaced out. A brother said Riddle had balance problems and episodes of lost focus. A friend said Riddle sometimes lost concentration, talked without making sense, and became forgetful. Another sister, Robanai Disque, said Riddle had memory problems and became angry easily when stressed out. Disque said Riddle had staring spells during which he spaced out and became unresponsive when she spoke to him, but snapped out of it when she touched him. After such episodes, Riddle seemed tired. *Id.* at 218. In the case record, these episodes are referred to as "staring spells," "absence seizures," or "spacing off."

After obtaining the witness statements in June 2007, Peeples started Riddle on prescription antiepileptic medications. *Id.* at 216. On a seizure questionnaire soon after this therapy began, Peeples indicated she believed Riddle was experiencing true seizures, but he had not been on appropriate treatment long enough to determine whether they would persist and they were not of a type that is difficult to control. *Id.* at 211-13. In July 2009, Peeples completed another questionnaire

5 - OPINION AND ORDER

from Riddle's representative. She said absence seizures could cause fatigue or loss of concentration or prevent a patient such as Riddle from resuming activities for one hour. Peeples opined Riddle could work 4 hours with a break between each hour. She thought Riddle's condition and medications would prevent him from meeting production quotas, making decisions quickly, and responding to emergencies. She opined that Riddle could not sustain a normal full time work schedule. *Id.* at 321-22.

In August and September 2009, Riddle was treated by Kenneth Wenberg, M.D. Dr. Wenberg obtained blood tests showing that Riddle's serum level of antiseizure medication was at the low end of the therapeutic range. Dr. Wenberg observed Riddle briefly "become unresponsive and tangential and just sitting there staring straight forward." *Id.* at 324. Riddle snapped out of it and carried on with the examination and Dr. Wenberg did not observe any after-effects. Dr. Wenberg increased Riddle's dosage of antiseizure medication. *Id.*

The administrative hearing was also in August 2009. Disque testified that she usually saw Riddle for a couple of hours at a time only once a month, but just before the hearing, Riddle had stayed at her house for a week. She worked during the day and had been unable to observe his daily activities. She had seen two episodes in which Riddle would stare straight ahead and would not react if she waved her hand in front of his face. The episodes lasted from 30 seconds to almost two minutes, after which Riddle would move slowly and did not talk very much. *Id.* at 36-37.

In October 2009, after the ALJ issued his decision, Barbara Wallner, a nurse practitioner, completed a questionnaire from Riddle's representative. The court may consider evidence submitted to the Appeals Council, which the ALJ did not see, in determining whether the ALJ's decision is supported by substantial evidence. *Ramirez v. Shalala*, 8 F.3d 1449, 1451-52 (9th Cir. 1993).

Wallner opined that Riddle had impairments that could reasonably be expected to cause balance problems, dizziness, loss of concentration due to vestibular disturbance, and loss of concentration and fatigue due to absence seizures. She said the after effects of absence seizures could include one hour of fatigue or loss of concentration before activities could be resumed. She said Riddle's medications could impair his ability to meet production quotas, make decisions quickly, and respond to emergencies. Wallner opined that Riddle would not be able to sustain a full time work schedule without being absent or leaving work early at least twice per month. *Id.* at 330-31.

A careful review of the evidence reveals that there is no documented description of Riddle's typical seizure pattern by a physician or other witness, at a time when he was receiving appropriate treatment. There is no information suggesting that Riddle experiences alteration of awareness or significant interference with activities during the day while he has therapeutic blood levels of medication. The descriptions from his siblings and friend predated his initial treatment with antiseizure medications and describe only his untreated condition. Similarly, the seizure episodes described by Dr. Wenberg and Disque, occurred during the period in which Dr. Wenberg found Riddle had inadequate serum levels of medication. Accordingly, Riddle has not met his burden of producing evidence that shows he meets the criteria for Listing 11.03.

Nor has Riddle shown that his condition is equivalent in severity to the Listing criteria. The ALJ found that Riddle experiences brief episodes that do not significantly interfere with his activities during the day. Admin. R. 12. This is supported by the record. While on medication, Riddle reported that he was not having problems with seizures (*Id.* at 298), that the episodes occurred in predictable, avoidable situations such as when he is very bored and after intense physical labor (*Id.* at 292-93, 295-96), that he was stable and safe to drive (*Id.* at 289), and that he was able to anticipate

7 - OPINION AND ORDER

and avert the onset of a seizure episode (*Id.* at 284-86). There is no reliable evidence that, while taking adequate levels of antiseizure medication, Riddle experiences alteration of awareness, loss of consciousness, or postictal manifestations causing significant interference with activities during the day. At most, the questionnaires provided by Peeples and Wallner suggest that Riddle's condition could include after-effects such as fatigue or loss of concentration, that might interfere with activities for up to an hour. However, there is no evidence that these after-effects actually occur and Riddle's reporting appears to indicate that they do not. Theoretical or potential limitations are not sufficient to establish equivalence with the listing criteria.

The ALJ considered all the evidence Riddle presented to show the severity of his impairments and the ALJ concluded the record did not establish that Riddle's condition is medically equivalent to the criteria for Listing 11.03. Admin. R. 12-20. That conclusion is consistent with the findings and opinions of the agency reviewing medical experts and the record as a whole. *Id.* at 261, 263, 267, 269-76. Riddle has not identified any evidence the ALJ neglected to consider. Accordingly, the court must uphold the ALJ's conclusion that Riddle did not prove his condition is medically equivalent to Listing 11.03.

## III.  Credibility Determination

In his application documents, Riddle alleged disability beginning in March 2007 due to seizures, vestibular dysfunction, dizziness, poor memory, and headaches. Admin. R. 9, 118, 133. He indicated that standing and walking were limited by imbalance from vestibular weakness and memory and concentration were impaired due to partial seizures. *Id.* at 133. Riddle was not taking antiseizure medications when he completed these documents. *Id.* at 136. His seizure-like episodes involved staring, spacing off, zoning out, and losing thought and concentration. He said there was

8 - OPINION AND ORDER

no warning when an episode was about to begin. After an episode, he usually felt tired and had a headache. *Id.* at 137.

At the administrative hearing in August 2009, Riddle testified that he stopped working because visual stimuli were making him dizzy and nauseated while driving. *Id.* at 28. He described his absence seizures as forgetting plans he had made, forgetting conversation he had engaged in the previous day; sometimes he would stop talking and space off in the middle of a sentence. He testified these episodes occurred once or twice a day, lasting from 30 seconds to a couple of minutes. Afterwards, it would take 15 minutes to an hour to recover. *Id.* at 28-29. Riddle said he was taking Depakote and an antidepressant medication with no side effects except that he often felt tired. *Id.* at 34.

The ALJ accepted Riddle's allegations that he experiences absence seizures, vestibular weakness, and mental impairments resulting in significant limitations described in the RFC assessment, *viz.* no more than light exertion; no more than occasional stooping, crawling, crouching, kneeling, balancing, or climbing stairs or ramps; no climbing ladders; no exposure to hazards; short simple instructions and routine tasks; no interactions with the general public and no more than superficial interactions with coworkers. *Id.* at 13. The ALJ did not believe Riddle's claim that his symptoms are so intense, persistent, frequent, and limiting that he cannot perform work within the restrictions in this RFC assessment. *Id.* at 14.

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged and no affirmative evidence of malingering exists, the ALJ must assess the credibility of the claimant regarding the severity of symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08

(9th Cir. 1986); Social Security Ruling ("SSR") 96-7p, 1996 WL 374186. Here, the ALJ found Riddle's medically determinable impairments could reasonably be expected to produce the symptoms he alleged. He was therefore required to assess Riddle's credibility regarding the severity and limiting effects of his symptoms. *Smolen*, 80 F.3d at 1281-82.

An ALJ may discredit the claimant's testimony regarding the severity of symptoms by providing specific reasons for the credibility finding, supported by evidence in the case record. SSR 96-7p, 1996 WL 374186, at *4. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008). In addition, an ALJ's adverse credibility finding must be explained with clear and convincing reasons. *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008); *Lingenfelter v. Astrue,* 504 F. 3d 1028, 1036 (9th Cir. 2007).

In assessing credibility, an ALJ must consider all the evidence in the case record, including the objective medical evidence, the claimant's treatment history, medical opinions, daily activities, work history, the observations of third parties with knowledge of the claimant's functional limitations, and any other evidence that bears on the consistency and veracity of the claimant's statements. 20 C.F.R. §§ 404.1529(c), 416.929(c); *Tommasetti*, 533 F.3d at 1039; *Smolen*, 80 F.3d at 1284; SSR 96-7p, 1996 WL 374186, at *5.

The ALJ thoroughly discussed the medical evidence, which included minimal objective findings and lacked findings of functional limitations that would preclude work. Admin. R. 14-19. In March 2007, when Riddle said his disability began, Dr. Cancado obtained testing which suggested vestibular weakness and a possible partial onset seizure disorder. *Id.* at 237. His clinical

10 - OPINION AND ORDER

observations and physical examination did not suggest functional limitations, however. Dr. Cancado indicated he had insufficient knowledge to form an opinion about the frequency, severity, or interference with function that would result from Riddle's medical condition. *Id.* at 235. Similarly, nurse Peeples saw Riddle regularly in 2007 and 2008 and consistently obtained objective findings within normal limits, except in June 2007, when Riddle appeared to have "a bit of an ataxic gait." *Id.* at 216. The ALJ correctly observed that Riddle obtained little other treatment except medication management to monitor his antiseizure medications. *Id.* at 16.

The ALJ found that the frequency and severity of Riddle's seizures were undocumented by objective observations. *Id.* at 16. As noted previously, Peeples obtained statements from lay witnesses describing Riddle's symptoms. Reportedly, Riddle sometimes forgot plans and conversations, lost focus and concentration, became angry easily, spaced out, became unresponsive but could be redirected, and seemed tired. *Id.* at 218. These statements did not provide information about the frequency or severity of these symptoms or identify work-related activities that Riddle could not do. In addition, these observations were made before Riddle began treatment with antiseizure medication. As described previously, Dr. Wenberg observed Riddle briefly "become unresponsive and tangential and just sitting there staring straight forward." *Id.* at 324. Riddle snapped out of it and carried on with the examination. Dr. Wenberg did not observe any significant after-effects and found Riddle had low serum levels of medication at the time. *Id.* Dr. Wenberg's progress notes contradicted Riddle's testimony that it takes 15 minutes to an hour for him to recover after experiencing a seizure episode.

Riddle's statements to providers regarding the frequency and severity of seizures suggested they improved with medication. In September 2007, Riddle told Peeples he was not having

11 - OPINION AND ORDER

problems with spacing out, seizures or dizziness. *Id.* at 298. Later that month, Riddle said he was

having seizures only when he was very tired or very bored, but they did not last long. *Id.* at 296. In

October and November 2007, he told Peeples he was having seizures after intense physical exertion;

he denied having seizures when he was less active. *Id.* at 292. In January 2008, Riddle reported he

was able to anticipate and avert a seizure when he felt it beginning. *Id.* at 286. At the hearing, Riddle

testified he experienced one or two seizure episodes daily, each requiring 15 minutes to an hour of

recovery. *Id.* at 28-29. These inconsistencies support an inference that Riddle's subjective

statements about the frequency and severity of seizures was not entirely reliable.

Riddle's statements to providers regarding the frequency of seizures suggest that Riddle has

much less seizure activity, when he maintains a sufficient serum level of medication. The ALJ

reasonably drew the inference that Riddle's symptoms are generally controlled by medications. *Id.*

at 16. Impairments that are controlled by medication are not disabling. *Warre v. Comm'r of Soc.*

*Sec. Admin.,* 439 F.3d 1001, 1006 (9th Cir. 2006). Medical improvement from treatment is a proper

basis for an adverse credibility determination, if the claimant's statements reflect his condition before

receiving treatment or assert a lack of improvement. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169

F.3d 595, 599 (9th Cir. 1999); *Tidwell v. Apfel,* 161 F.3d 599, 601 (9th Cir. 1998).

The ALJ also found Riddle's reported activities were inconsistent with his alleged functional

limitations and inability to work within appropriate restrictions. Admin. R. 12, 17. For example,

Riddle continues to drive and maintains a valid commercial driver's license, without objection from

his health care providers. *Id.* at 245. This supports the inference that Riddle's symptoms are

controlled by medications. If Riddle were experiencing daily uncontrolled seizures plus dizziness

and vertigo, as he claimed in his testimony, it is not reasonable that he would continue to drive or that his health care providers would not intervene to prevent him from driving.

Riddle's activities include living independently, performing household chores, performing ranch chores, doing repairs, mowing the lawn, shopping, managing money, woodworking, going to movies, and entertaining his children. He denied any difficulty following written or verbal instructions or getting along with others. *Id.* at 128-33. In May 2007, Riddle reported he had accumulated 100 hours of work for his landlady which he hoped to exchange for rent. *Id.* at 220. At about the same time, Riddle explored retraining opportunities through a community action program to learn a new occupation. *Id.* The ALJ could reasonably infer that Riddle did not consider himself unable perform work within appropriate limitations. In January 2008, he told Peeples he was working with livestock "all day long" and was happy with the physical labor. *Id.* at 286. Later, at the hearing, Riddle contradicted this when he testified that his ranch chores were minimal and amounted to less than one hour each day. *Id.* at 32. These inconsistencies support an adverse inference as to credibility.

The ALJ's credibility determination is supported by inferences reasonably drawn from the record. His decision provides an adequate basis for the court to conclude that the ALJ did not discredit Riddle's subjective statements arbitrarily. His explanation is clear and convincing and the credibility determination is upheld. *Tommasetti*, 533 F.3d at 1039; *Batson*, 359 F.3d at 1193; *Thomas*, 278 F.3d at 958.

## IV.    Lay Witness Statements

Riddle contends the ALJ improperly rejected the lay witness statements. As described previously, nurse Peeples obtained statements by telephone from Riddle's siblings and a friend in

13 - OPINION AND ORDER

June 2007. In addition, Disque provided written statements in 2007 and testified at the hearing in August 2009.

An ALJ must consider lay witness statements concerning a claimant's ability to work. *Stout v. Comm'r, Soc. Sec. Admin.,* 454 F.3d 1050, 1053 (9th Cir. 2006). Lay statements as to the claimant's symptoms or how an impairment affects the ability to work cannot be disregarded without comment. *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996). If the ALJ wishes to discount the statements of a lay witness, he must give reasons that are germane to the witness. *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001).

The ALJ's decision demonstrates that he considered the lay witness statements. He noted the observations of family members and a friend from June 2007. Admin. R. 15. As shown previously, these statements do not address the frequency or severity of Riddle's symptoms or purport to describe Riddle's ability to perform work-related activities. They are not probative of his condition while receiving appropriate treatment. The ALJ did not need to discount these statements to reach his assessment of Riddle's RFC. Accordingly, he was not required to provide reasons for discounting the statements.

The ALJ also considered Disque's written statement from July 2007 and testimony from August 2009. *Id.* at 19-20. In her written statement, Disque said seizures prevent Riddle from driving. He tires after 30 minutes of shopping, becomes angry easily, cannot remember instructions, needs to rest for fifteen minutes after being on his feet for ten to fifteen minutes. *Id.* at 147.

At the hearing in 2009, Disque testified that during seizures, Riddle would stare straight ahead and would not react if she waved her hand in front of his face. They lasted from 30 seconds to almost two minutes, after which he would move slowly and did not talk very much. Disque said

14 - OPINION AND ORDER

she usually sees Riddle for a couple of hours at a time once a month. Before the hearing, he had stayed at her house for a week and she had observed two seizures. *Id.* at 36-37. When asked to describe periods of vestibular dysfunction, Disque testified that after a seizure, Riddle walks with a slow gait with arms wide instead of at his side. When walking down stairs he hangs on to something. He can lose his balance when rising from a seated position. *Id.* at 37.

The ALJ did not give these statements full weight to the extent they implied that Riddle's fatigue and deficits in maintaining concentration and social functioning precluded all work activity. *Id.* at 20. The ALJ relied on Disque's testimony that she typically sees Riddle only once or twice a month for a couple of hours. *Id.* at 20, 36, 142. Indeed, Disque had only seen one seizure episode at the time she completed the her written statement in July 2007 *Id.* at 20, 151. In her 2009 testimony, Disque described only two such episodes from a period during which Riddle's serum level of medication was inadequate. This supports the inference that Disque's statements about the frequency and severity of Riddle's symptoms cannot be based on her own observations.

The ALJ found Disque's statements inconsistent with the medical evidence which suggested that Riddle's seizures were generally controlled by antiepileptic medication. After starting medication, Riddle reported fewer seizures, in specific circumstances, that he was able to anticipate and avert. *Id.* at 286, 290, 292, 296, 298. The two seizures Disque described in her testimony occurred during a time when Dr. Wenberg determined Riddle's serum level of medication was inadequate. The inference that Riddle's seizures were generally controlled when he maintained an appropriate medication level flows logically from this evidence.

The ALJ also found Disque's statements inconsistent with Riddle's own description of his limitations. *Id.* at 20. For example, Disque indicated that Riddle's ability to follow instructions was

15 - OPINION AND ORDER

poor and he had difficulty functioning socially. *Id.* at 147. Riddle denied any difficulty following

instructions or getting along with others. *Id.* at 133. The ALJ also found Disque's implication that

Riddle could not maintain any kind of work-like activities due to fatigue, lack of concentration, or

poor social functioning, inconsistent with his reported activities, including working for his landlady,

working with livestock all day, living independently, and other activities described previously in the

discussion of Riddle's credibility. Where an ALJ gives sufficient reasons for discounting the

credibility of a claimant's subjective statements, those reasons are germane to a lay witness giving

statements of similar substance. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th

Cir. 2009).

The ALJ's decision makes clear that he did not arbitrarily discount Disque's lay statements

without comment. The ALJ considered her statements and found they were not entitled to full

weight for germane reasons flowing logically from substantial evidence in the record as a whole.

*Lewis*, 236 F.3d at 511; *Nguyen*, 100 F.3d at 1467. The ALJ's evaluation of the lay witness

statements is upheld.

## V.    Medical Source Statements of Nurse Peeples

Riddle contends the ALJ improperly discounted Peeples's medical source statements. As

described previously, Peeples submitted an agency seizure questionnaire in June 2007, based on her

treatment of Riddle, his subjective reports to her, and telephone interviews with siblings and a friend.

Peeples indicated Riddle did not experience alterations of awareness or consciousness, but did have

transient post-seizure staring behavior. Admin. R. 212. She said Riddle reported a seizure frequency

of three per day. *Id.* She said the seizures had not persisted despite compliance with medication

therapy for at least six months, presumably because his treatment had just started. She did not think

16 - OPINION AND ORDER

the seizures were of a type that would be difficult to control. Peeples opined Riddle's seizures resulted in significant interference with work-related activities by causing difficulty concentrating, following through with a task to completion, and processing the visual and auditory stimuli involved in his work as a truck driver. *Id.* The ALJ credited Peeples's statement and gave it significant weight in formulating his RFC assessment. *Id.* at 19 (note pagination error transposing pages 18 and 19 of the administrative transcript.)

In July 2009, Peeples completed a questionnaire from Riddle's representative. She opined that Riddle could not return to his former work as a truck driver, that he could safely walk or stand for up to four hours in an 8-hour workday, and that Riddle could not sustain a full-time work schedule without missing work or leaving early at least two days a month due to limitations from his vestibular dysfunction or absence seizures. *Id.* at 322. The ALJ accepted some of Peeples's opinion but gave little weight to her statement that Riddle could not sustain any work on a full-time basis. *Id.* at 18 (note pagination error.)

An ALJ is required to consider and give due weight to all relevant evidence in the case record, including opinion evidence from medical sources such as nurse practitioners who have seen the claimant in their professional capacity. 20 C.F.R. §§ 404.1527(b), 416.927(b); SSR 06-03p, 2006 WL 2329939, *4. The regulations treat nurse practitioners as "other sources." 20 C.F.R. §§ 404.1513(a), (d), 416.913(a), (d). The statements of "other sources" are evaluated as lay witness statements. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223-24 (9th Cir. 2010). Accordingly, to properly discount Peeples's opinion, the ALJ was required to give reasons germane to the witness. *Id.*, *Lewis*, 236 F.3d at 511.

The ALJ gave germane reasons. Admin. R. 18. He correctly found Peeples's opinion was not accompanied by treatment records documenting objective findings or clinical observations. He correctly found Peeples's opinion did not identify specific functional limitations or work-related activities Riddle could not do. The ALJ correctly found that there was little evidence in the case record from individuals who actually observed Riddle experiencing seizures. Certainly, Peeples did not claim she had seen any seizure episodes. Likewise, there was no objective evidence regarding the frequency of the seizures. As a result, the primary source of the information supporting Peeples's opinion was Riddle's subjective reporting, which the ALJ found less than fully reliable. The ALJ reasonably interpreted Riddle's statements to indicate that the seizures do not interfere in a disabling way with his activities. Riddle suggested he did not always even notice when he had a seizure. He reported working with livestock all day, driving, and maintaining a commercial drivers license without objection from Peeples or any of his health care providers. These reasons are germane and provide a legally sufficient basis for the ALJ's determination that Peeples's questionnaire was entitled to less than full weight.

## VI.    **Mental Residual Functional Capacity**

Riddle contends the ALJ failed to evaluate his mental impairments in compliance with applicable regulations and Social Security Rulings. The evaluation of mental impairments is governed by 20 C.F.R. §§ 404.1520a, 416.920a. The regulations prescribe a psychiatric review technique which the ALJ must follow in evaluating mental impairments. The first step of the technique is to determine whether a claimant has a medically determinable mental impairment. 20 C.F.R. §§ 404.1520a(b), 416.920a(b). Here the ALJ found Riddle has medically determinable

mental impairments of depressive disorder and anxiety disorder, consistent with the findings of the agency reviewing psychologists. Admin. R. 11, 254, 256.

The second step of the psychiatric review technique is to rate the degree of functional limitation in each of four broad functional areas:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c), 416.920a(c). Here, the ALJ relied on the agency psychological experts and found that Riddle had mild restrictions in activities of daily living, moderate difficulty in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. Admin. R. 12, 261.

The third step of the psychiatric review technique is to determine the severity of the impairments. If all four of the broad functional areas are rated "none" or "mild," the Commissioner will generally conclude that the claimant does not have a mental impairment that is severe within the meaning of the regulations. 20 C.F.R. §§ 404.1520a(d), 416.920a(d). Here, the ALJ rated two of the four broad functional areas moderately impaired, and correctly concluded that Riddle's mental impairments were severe within the meaning of the regulations. Admin. R. 11-12.

If the claimant has a severe impairment, the psychiatric review technique requires the ALJ to compare the severity of the impairment to the severity criteria for the presumptively disabling conditions in the Listing of Impairments. Here, the ALJ compared Riddle's degree of impairment in the four broad functional areas to the criteria for listing 12.04 *Affective Disorders* and listing 12.06 *Anxiety-Related Disorders*. Admin. R. 12. To meet or equal either of these listings, a claimant must show a marked degree of functional impairment in at least two of the four broad functional areas. Listing of Impairments, §§ 12.04, 12.06. Here, the ALJ properly determined that Riddle did not

19 - OPINION AND ORDER

meet or equal either listing because he was not impaired to a marked degree in at least two of the broad functional areas. Admin. R. 12-13.

If an impairment is severe, but neither meets nor is equivalent in severity to a listed impairment, the psychiatric review technique requires the ALJ to assess the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a(d)(3). Here, the ALJ assessed Riddle's RFC, as required by the regulations. Admin. R. 13-20. Accordingly, the ALJ complied with the psychiatric review technique governing the evaluation of mental impairments.

Riddle argues that the RFC assessment is flawed because it does not reflect the moderate difficulties the ALJ found in the broad functional area of maintaining concentration, persistence, or pace. In assessing a claimant's RFC, the Commissioner does not use the four broad functional areas. The RFC evaluation requires a more detailed assessment by itemizing specific work-related abilities. SSR 96-8p, 1996 WL 374184 at *4. For this purpose, the four broad functional areas are broken into 20 specific work-related abilities enumerated on the standard Mental Residual Functional Capacity ("MRFC") worksheet. The broad functional area for difficulties maintaining concentration, persistence, or pace is broken into eight specific abilities on the MRFC.

Here, the agency psychological expert, Bill Hennings, Ph.D., indicated Riddle had moderate impairment in two of the eight specific work-related abilities within the broad functional area for concentration, persistence, or pace. He found Riddle had moderately limited ability to carry out detailed instructions and moderately limited ability to maintain attention and concentration for extended periods. Admin. R. 265. In narrative comments, Dr. Hennings elaborated on these summary conclusions by stating "[Riddle] has some difficulty with attention and concentration but can do so for 2 hr periods with normal breaks in routine settings." *Id.* at 267. The ALJ's RFC

20 - OPINION AND ORDER

assessment is entirely consistent with Dr. Hennings's findings and complied fully with the regulations and SSRs governing the evaluation of mental impairments.

## VII.  Vocational Evidence

At step five of the decision-making process, the Commissioner must show that a significant number of jobs exist which the claimant can perform despite his functional limitations. *Andrews v. Shalala*, 53 F.3d at 1043. An ALJ can satisfy this burden by eliciting the testimony of a VE with a hypothetical question that sets forth all the limitations of the claimant. *Id.; Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001). Here, the VE testified that a person of Riddle's age, education, work experience, and RFC could perform the activities required for light unskilled occupations such as hardware assembly, small parts assembly inspection, and packaging. *Id.* at 40-41. The Commissioner concedes that the ALJ's reliance on the testimony relating to the packaging occupation was erroneous. The VE's testimony establishes that the remaining two occupations represent over 330,000 jobs in the national economy. *Id.*

Riddle contends the remaining two occupations identified by the VE also exceed the limitations in his RFC assessment because they require the ability to understand and carry out instructions that do not fit the limitations in his RFC. Riddle's RFC limits him to work requiring the ability to "understand, remember, and carry out short, simple instructions and perform routine tasks." Admin. R. 13. Riddle relies on auxiliary information appended to the DOT job definitions for the occupations hardware assembly and small parts assembly inspection.

The main definition for each occupation described in the DOT summarizes the actions required and the specific tasks the worker must perform in the occupation. Following the main job description, auxiliary information is appended in a "definition trailer" comprised of a list of

21 - OPINION AND ORDER

numerical codes. Among the various components of the definition trailer is the general education development ("GED"), which approximates the educational level the worker must have achieved for satisfactory job performance. The GED is broken down into categories for math, language, and reasoning. DOT, Appendix C.[1]

Notably, Riddle does not contend he is unable to perform the actions or specific tasks described in the main job descriptions for the two challenged occupations. Instead, he contends his RFC precludes work requiring a reasoning ability corresponding to the reasoning development code component of the GED component of the definition trailer appended to the main job descriptions. This argument is unpersuasive.

The occupations identified by the VE have GED reasoning development codes of two. Reasoning development at this level means the worker can "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions [and] deal with problems involving a few concrete variables in or from standardized situations." DOT, Appendix C. The RFC assessment restricted Riddle to short, simple instructions and routine tasks. Admin. R. 13. Riddle contends the reasoning code reference to detailed instructions is inconsistent with the RFC limitation to short, simple instructions.

There is no inconsistency because instructions can be detailed without being difficult, complicated, or complex. The ability to carry out simple instructions is consistent with reasoning level two. *See Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (level two reasoning appears consistent with simple and routine work tasks); *Money v. Barnhart*, 91 Fed. Appx. 210, 214 (3rd Cir. 2004)(reasoning level two does not contradict limitation to simple, routine, repetitive

---

[1] *Available at* http://www.oalj.dol.gov/PUBLIC/DOT/REFERENCES/DOTAPPC.HTM.

work); *Tracer v. Astrue*, 2011 WL 2710271, * 10 (D. Or. July 12, 2011) (same); *Koch v. Astrue*, 2009 WL 1743680 at *17 (D. Or. June 15, 2009) (level two reasoning is consistent with simple, routine tasks); *Harrington v. Astrue*, 2009 WL 102689 at *2 (S.D. Cal. Jan. 14, 2009) (simple, repetitive work is consistent with the definition of GED reasoning level two);; *Meissl v. Barnhart*, 403 F. Supp. 981, 984 (C.D. Cal. 2005).(same).

Riddle also challenges the VE's testimony on the ground that the ALJ used hypothetical assumptions that did not reflect all of his functional limitations. The ALJ considered all the evidence and reached an RFC assessment based on the limitations supported by the record as a whole. The ALJ was not required to incorporate additional limitations he found unsupported by the record. *Osenbrock*, 240 F.3d at 1163-65; *Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989). The ALJ properly relied on the VE's testimony because the hypothetical assumptions "contained all of the limitations that the ALJ found credible and supported by substantial evidence in the record." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005). Riddle's contention that the Commissioner's determination was based on improper vocational testimony cannot be sustained.

## VIII.  Appeals Council

Riddle submitted evidence to the Appeals Council after the ALJ issued his decision. This evidence included the progress notes from August and September 2009 in which Dr. Wenberg observed a staring spell and determined through blood tests that Riddle required an increase in dosage of his antiseizure medication. Admin. R. 324-29. The additional evidence also included the questionnaire completed and signed in October 2009, by nurse Wallner. *Id.* 330-31. This evidence has been discussed earlier in this opinion in determining that the ALJ's decision is supported by substantial evidence. *Ramirez*, 8 F.3d at 1451-52.

Riddle now argues that the Appeals Council should have remanded the matter to the ALJ based on this evidence. In fact, however, the Appeals Council declined to review the case. Admin. R. 1-4. If new and material evidence is submitted which relates to the period on or before the date of the ALJ's decision, the Appeals Council must evaluate the entire record including the new and material evidence, and review the case if it finds the ALJ's findings or conclusions are contrary to the weight of the evidence. 20 C.F.R. §§ 404.970(b), 416.1470(b). Accordingly, the Appeals Council must review the case if the evidence is new and material and taken together with the record as a whole, shows that the ALJ's findings are contrary to the weight of the evidence.

Evidence is material only where it creates a reasonable possibility that the outcome of the case would change. *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380-81 (9th Cir. 1984). The evidence from Dr. Wenberg and nurse Wallner is not material as shown earlier in this opinion. To summarize, Dr. Wenberg's observations reflect Riddle's symptoms when he had inadequate serum levels of medication. The apparent association between Wallner and Dr. Wenberg suggests that her questionnaire suffers from the same flaw. In addition, Wallner's questionnaire was not supported by objective findings, clinical observations, or treatment records. A conclusory opinion unsupported by clinical findings does not create a reasonable possibility of changing the outcome. *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999). At most, Wallner suggested limitations that were potential or theoretical; she offered no evidence of actual functional limitations. For these reasons, the evidence Riddle presented for the first time to the Appeals Council does not create a reasonable possibility that the outcome of the case would change. *Booz*, 734 F.2d 1378. For the same reasons, the evidence, taken together with the record as a whole, does not establish that the

Case 6:10-cv-00358-AA   Document 19   Filed 08/15/11   Page 25 of 25

ALJ's findings or conclusions are contrary to the weight of the evidence. Accordingly, the Appeals Council was not required to review the case under 20 C.F.R. §§ 404.970(b), 416.1470(b).

## CONCLUSION

The Commissioner's decision is based on proper legal standards and the findings of fact are supported by substantial evidence in the record as a whole. Under these circumstances, the court must affirm the Commissioner. 42 U.S.C. § 405(g); *Batson,* 359 F.3d at 1193; *Andrews*, 53 F.3d at 1039-40. Accordingly, the Commissioner's decision is AFFIRMED.

IT IS SO ORDERED.

DATED this __11__ day of August, 2011.

Ann Aiken, Chief Judge
United States District Court

25 - OPINION AND ORDER